HOLLY SULLIVAN
California Bar Number 216376
Law Offices of Holly A. Sullivan
110 West "C" Street, Suite 2105
San Diego, CA 92101
Ph: (619) 269-8054
Email: hollyasullivan@yahoo.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE WILLIAM Q. HAYES)**

| | |
|---|---|
| UNITED STATES OF AMERICA | Case: 14CR3034 |
| Plaintiff, | Date: January 20, 2015 |
| vs. | Time: 2:00 p.m. |
| JOY MARSHALL | NOTICE OF MOTION TO: |
| Defendant. | 1) NOTICE UNDER FRCP 12.2 |
| | 2) SUPPRESS STATEMENTS |
| | 3) DISMISS INDICTMENT |

Please take note that Counsel seeks to have the following motions granted.

Date: January 5, 2015            /s/ *Holly A. Sullivan*

                                              HOLLY A. SULLIVAN

HOLLY SULLIVAN
California Bar Number 216376
Law Offices of Holly A. Sullivan
110 West "C" Street, Suite 2105
San Diego, CA 92101
Ph: (619) 269-8054
Email: hollyasullivan@yahoo.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE WILLIAM Q. HAYES)**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>            Plaintiff,<br><br>vs.<br><br>JOY MARSHALL<br><br>            Defendant. | MEMORANDUM IN SUPPORT OF MOTIONS |

## I. Statement of Facts

Ms. Marshall incorporates her previous statement of facts and additional facts in support of each motion addressed below.

## II. Notice under Criminal Rule of Criminal Procedure 12.2

Ms. Marshall gives notice of her intention to assert a voluntary intoxication diminished capacity defense if the case proceeds to trial. See Fed. R. Crim. Pro. 12.2. There is currently no expert notice to give on this issue.

The government will likely argue that a diminished capacity defense is not available for a "general intent" offense under United States v. Jim, 865 F.2d 211, 215 (9th Cir. 1989). Counsel acknowledges the findings of Jim but wishes to address this argument with the in limine motions and submission of jury instructions and preserves the issue for future appellate review.

2

1

2    **III.    Motion to Suppress Statements**

3          A.    <u>Introduction</u>

4          From the moment that Joy Marshall was forcefully and illegally restrained in

5    secondary inspection, she requested counsel.  Knowing this, agents then proceeded

6    to question Ms. Marshall.  At the time they chose to do this, they were aware of

7    numerous factors, in addition to her prior invocations of counsel, that should have

8    precluded their questioning at that point in time.  Ms. Marshall was causing physical

9    injury to herself, she had consumed large amounts of alcohol, and was acting as if she

10   was suffering from mental distress.  The statements made in response must be

11   suppressed.

12         B.    <u>Governing Law</u>

13         "For inculpatory statements made by a defendant during custodial interrogation

14   to be admissible in evidence, the defendant's waiver of Miranda rights must be

15   voluntary, knowing, and intelligent.  A valid waiver of <u>Miranda</u> rights depends upon

16   the totality of the circumstances including the background, experience, and conduct

17   of defendant."[1]

18         "A valid waiver of <u>Miranda</u> rights depends upon the totality of the

19   circumstances including the background, experience, and conduct of defendant."[2]  In

20   assessing those circumstances, the "following considerations guide [a court's]

21   inquiry: (1) whether the defendant signed a written waiver; (2) whether the defendant

22   was advised of his rights in his [her] native tongue; (3) whether the defendant

23   appeared to understand his [her] rights; (4) whether a defendant had the assistance of

24   a translator; (5) whether the defendant's rights were individually and repeatedly

25   explained to him [her]; and (6) whether the defendant had prior experience with the

26   _____

27         [1]<u>United States v. Garibay</u>, 143 F.3d 534, 536-37 (9th Cir. 2008).

28         [2]<u>Garibay</u>, 143 F.3d at 536.

                                           3

criminal justice system."[3]

"There is a presumption against waiver. The prosecution bears the burden of proving by a preponderance of the evidence that a defendant knowingly and intelligently waived his Miranda rights. To satisfy this burden, the prosecution must introduce sufficient evidence to establish that under the totality of the circumstances, the defendant was aware of the nature of the right being abandoned and the consequences of the decision to abandon it. The government's burden to make such a showing is great, and the court will indulge every reasonable presumption against waiver of fundamental constitutional rights."[4]

C.    Argument

1.    **Relevant Facts**

*a.  initial invocations*

Federal officers at the San Ysidro Port of Entry (POE) arrested Ms. Marshall in the early morning hours of September 21, 2014. Her companion in her car, Kelson Laborde-Dickson, was taken into ICE custody that day.

From the time that Ms. Marshall was brought into the secondary security office, she made it clear that she did not wish to speak with agents. As soon as Ms. Marshall was brought into the security office, multiple agents/officers were attempting to restrain her by pushing her face down into the ground and pressing their knees and bodies into her back and shoulder to prevent any movement. [See Exhibit A: D7[5]]. Agents were searching her pockets and Ms. Marshall was verbally screaming at agents and refusing a patdown. During this time, Ms. Marshall was screaming that "she wanted her lawyer." [D7]. Later, Ms. Marshall was housed in a holding cell

---

[3] Id at 538.

[4] Id.

[5] Counsel is attaching discovery reports as Exhibit A. All pages will be noted as D and the corresponding bates number.

4

where she continued to yell and demand to see a lawyer. [D8]. Multiple agents/officers acknowledge Ms. Marshall's repeat requests for counsel after she was in the holding cells at the Port of Entry. [D7, D8, D13]. While in the holding cell, prior to being brought into an interview room for questioning, the questioning agent came to see whether Ms. Marshall was willing to speak to agents as well as to determine her level of sobriety. At this time, Ms. Marshall again invoked her right to counsel. See Exhibit B, declaration of Ms. Marshall.

### b. statements of Kelson Laborde-Dickson

Prior to interrogating Ms. Marshall, agents spoke with her companion who was driving her car, Kelson Laborde-Dickson. During this interview, Mr. Laborde-Dickson informed agents that Ms. Marshall was "very intoxicated" when they arrived at the port. In approximating how much she had to drink, Mr. Laborde-Dickson stated Ms. Marshall had about 3 shots, 4 beers, and some vodka and coke. In piecing together the statements of both Ms. Marshall and Mr. Laborde-Dickson, the alcohol intake seems to have occurred over the course of about 6 hours time. A quick calculation for Ms. Marshall's body weight and amount of alcohol has an approximate blood alcohol concentration of .172- .211. In this range the physical effects could include the following: lack of motor skills and muscle coordination, blurred vision, slower reaction time and control, impaired perception, reduced information processing capability, poor coordination, loss of balance, substantial impairment in visual and auditory information processing.[6] Many of these physical effects were seen on the secondary video, confirming Mr. Laborde-Dicksons's assessment of Ms. Marshall's consumption.

Mr. Laborde-Dickson was inside the secondary port and was unable to see exactly what happened during the alleged assault but saw a "swarm of police

---

[6] See http://www.brad21.org/effects_at_specific_bac.html;
http://www.cdc.gov/motorvehiclesafety/impaired_driving/bac.html;
http://bloodalcoholcalculator.org/

officers." He further told agents that in Mexico that night he was fighting with Ms. Marshall and that they were robbed by Mexican police as well. Lastly, he noted that he was surprised to see Ms. Marshall drinking that much, had never seen her drink that much before, and that she normally does not have a temper.

### c. statements post-*Miranda*

The video of Ms. Marshall's statements post-interrogation does not begin with a date and time, however, later in the interrogation agents reference the time being approximately 12:45 p.m. on September 21, 2014. The case agent's report of investigation notes that at 12:15 p.m. Ms. Marshall was advised of the right to counsel. [D48]. While going over <u>Miranda</u> rights the lead agent notes that Ms. Marshall had already indicated what she wanted to do prior to this questioning.[7]

In the secondary security office, as noted above, Ms. Marshall was being forcibly restrained by multiple agents. She was face down on the floor with agents bodies and knees pushing into her back. Her shoulder was being forced backwards. After she was placed in the holding cell and cuffed, she was hitting her head against the wall. [D7]. In the cell, she was hitting her cuffed hands on a metal bench. [D6]. During this time she was under constant agent surveillance due to her "out of control" behavior. Because of this behavior, she was then physically moved by three officers to a padded cell. [<u>Id</u>.]. It appears that about 6:15 a.m. she was moved to the padded cell. [D13].

While in the padded cell officers continually monitored her to make sure that she was breathing and noted she had spit up blood in the cell. [D8]. For over an hour, she was talking to herself and rambling. [D13]. A physical medical evaluation was conducted after this time although no results or testing has been produced.

The CBPO first responder noted that during this assessment at approximately 7:55 a.m. on September 21, 2014, Ms. Marshall was "ranting" about being detained

---

[7] Any previous questioning has not been discovered to counsel.

and beaten up by police in Mexico. [D10]. Ms. Marshall additionally had physical injuries. She had swollen wrists, with her left wrist more visibly swollen, she had severe pain in her left shoulder and outside her left pectoral, and she was unable to lift her left shoulder past 90 degrees. [D10]. It was also noted that she had a lower lip which was visibly scraped. [Id.]. Ms. Marshall throughout the assessment was crying and ranting about being beaten by the Mexican police and how she was hurt. [Id.].

Ms. Marshall believed the agents were not "for any side." See Exhibit B. She was answering questions much like filling out a police report. As even greater support for her invocation, at the end of her "interrogation," Ms. Marshall says, and that's why I want a lawyer.

### 2. Ms. Marshall's Statements are Inadmissible

#### a. initial invocations

Pursuant to Miranda v. Arizona, 384 U.S. 436,(1966), a person has a right to the assistance of counsel during custodial interrogations. In Edwards v. Arizona, 451 U.S. 477 (1981), the Supreme Court held that Miranda established that "when an accused has invoked his right to have counsel present," he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484–85. Moreover, even if an accused initiates further communication, a Miranda violation might occur if interrogation ensues.

Under Davis v. United States, 512 U.S. 452, 456, 459 (1994), the right to counsel must be unequivocal. Davis, following Edwards, requires officers to cease questioning immediately upon the making of a clear request for counsel. Davis, 512 U.S. at 459. "No authority, and no logic, permits the interrogator to proceed ... on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all." Smith v. Illinois,

469 U.S. 91, 99 (1984) (omission in original) (quotation marks and citation omitted). "To that end, we have held that a suspect who has invoked the right to counsel cannot be questioned regarding any offense unless an attorney is actually present." Davis, 512 U.S. at 458 (citing to Minnick v. Mississippi, 498 U.S. 146 (1990) and Arizona v. Roberson, 486 U.S. 675 (1988).)

Here, Ms. Marshall repeatedly invoked her right to counsel. She did so multiple times prior to interrogation to anyone who would listen. Her repeated assertions to counsel were so clear that officers repeatedly referenced her invocations in their reports. Additionally, when the interrogating case agent first comes to the holding cell to ask her if she is willing to speak to him, she again invokes her right to counsel. See Exhibit B. Similarly to the defendant in Sessoms v. Grounds, 768 F.3d 882, 892-893 (9th Cir. 2014), Ms. Marshall invoked her right to counsel prior to receiving any advice regarding counsel. Her statements at the end of the interrogation, "and that's why I want a lawyer," clearly indicate her desire to counsel from the moment of her being brought into the holding cell until the end of questioning.

### b. post-*Miranda*

If this Court does not find Ms. Marshall's repeated invocations of her right to counsel warrant suppression, under the totality of the circumstances, these statements must also be suppressed. Under "the totality of the circumstances including the background, experience, and conduct of" Ms. Marshall, the government cannot meet its burden of demonstrating a knowing and voluntary waiver. "[W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.' " Edwards v. Arizona, 451 U.S. 477, 482 (1981). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice

rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986).

The circumstances of her arrest, the context of her waiver, as well as the conclusion of her statements, undercuts this one circumstance that weighs toward finding a knowing waiver by Ms. Marshall. The physical condition of a defendant at the time of arrest is an important factor in determining whether any subsequent confession was voluntary. See Greenwald v. Wisconsin, 390 U.S. 519, 520–21 (1968).

Here, Ms. Marshall repeatedly invoked her right to counsel to anyone who would listen. Prior to the purported "waiver" of rights, she invoked her right to counsel. The circumstances which brought her into the interrogation room involve the following: drinking heavily, being sexually assaulted and robbed by police in Mexico, having a fight in Mexico with her companion, being detained in secondary while her friend was taken from the car, being physically thrown against her car then physically restrained by officers, being forcefully detained by officers inside the port, being forcefully taken into a padded cell, and being held in a holding cell. The circumstances and context of any waiver is suspect. Lastly, Ms. Marshall's statement to agents at the end of the interrogation that this is why she wants a lawyer further supports an unknowing waiver.

The final circumstance under Garibay—"whether the defendant had prior experience with the criminal justice system"[8]—also weighs toward a conclusion that Ms. Marshall did not knowingly waive her rights. Ms. Marshall is a twenty-five year old young woman with a minor misdemeanor arrest in 2006, when Ms. Marshall was only eighteen years old. Sitting there in custody, hours after a physically and

---

[8] Garibay, 143 F.3d at 538.

emotionally tumultuous night, Ms. Marshall did not knowing and voluntarily waive her rights under <u>Miranda</u>.

**IV.    Dismiss Indictment for Due Process and Compulsory Process Violations**

"Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth Amendment guarantee of due process, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." <u>United States v. Leal-Del Carmen</u>, 697 F.3d 964 (9th Cir. 2012)(citing to <u>United States v. Stever</u>, 603 F.3d 747, 755 (9th Cir.2010)).

Even if conduct does not rise to the level of a due process violation, this court can dismiss the indictment under its supervisory powers.  <u>See</u> <u>United States v. Stinson</u>, 647 F.3d 1196, 1210 (9th Cir. 2011) (citing to <u>United States v. Barrera–Moreno</u>, 951 F.2d 1089, 1091 (9th Cir.1991)).  This is a power "to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct." <u>Id</u>.

A.    <u>Outstanding witnesses</u>

In addition to the issues discussed below, there are still outstanding witnesses, which counsel believes could have exculpatory information under <u>Brady</u> and <u>Giglio</u> who have not yet been produced to counsel.  These include: 1) the officer who was standing directly next to CBPO Garripo at the time of conversations prior to CBPO Garripo's attempt to physically restrain Ms. Marshall; and 2) the names and any contact information for any of the other people who were located in secondary inspection over this course of events.  There are numerous cars around Ms. Marshall and her car at the time of all of these events.  TECS records, at a minimum, would be able to give information concerning potential witnesses in secondary inspection at this time.  Even lacking this discovery, the following witnesses and evidence are relevant and material.

B. <u>Deporting material witness</u>

### 1. Case Law

In <u>United States v. Valenzuela-Bernal</u>, 458 U.S. 858 (1982), the Supreme Court addressed whether the deportation of a material witness would violate a defendant's constitutional right to compulsory process. The Court determined that when the government is responsible for the delay which resulted in the loss of evidence, a violation exists when the loss prejudiced the defense. <u>Id</u>. at 868. In conducting this analysis, the witness must be shown to be favorable and material. <u>Id</u>. at 872. Sanctions would only be warranted if "there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." <u>Id</u>. at 874 (citing <u>Giglio v. United States</u>, 405 U.S. 150 (1972)).

More recently, in <u>United States v. Leal-Del Carmen</u>, 697 F.3d 964 (9th Cir. 2012), the Ninth Circuit held the government's deportation of a material exculpatory witness in an alien smuggling case, violated Leal-Del Carmen's Fifth Amendment due process rights and Sixth Amendment right to compulsory process. In a strongly worded opinion by Chief Judge Kozinski, the Ninth held the government cannot deport an illegal alien who can provide exculpatory evidence for a criminal defendant. In <u>Leal</u>, the government kept witnesses who supported Leal being a leader or giving directions in the travel of other witnesses but deported Garcia-Garcia who denied that he gave any orders. <u>Id</u>. at 968.

<u>Leal-Del Carmen</u> laid out a two part test to evaluate whether a constitutional violation occurred. <u>Id</u>. at 969-970. First, the defendant must show that the government acted in bad faith. <u>See Id</u>. (citing to <u>United States v. Dring</u>, 930 F.2d 687, 693 (9th Cir.1991).) <u>Leal-Del Carmen</u> noted there is no violation where the government made a "good-faith determination" that the alien-witness did not possess exculpatory evidence. <u>Id</u>. at 970 (citing to <u>Valenzuela–Bernal</u>, 458 U.S. at 872–73) Second, the defendant must demonstrate that deportation of the witness prejudiced his case. <u>Id</u>. "To prevail under the prejudice prong, the defendant must at least make

'a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses.' " Id. at 970 (internal citations omitted).

In analyzing the first prong, the Court opined if the government interviews the witness and has some information suggesting they could offer exculpatory evidence, the government may not deport him without first giving defense counsel a chance to interview him. Id. at 970. "Once the government is aware that an alien has potentially exculpatory evidence, it must treat that person as a material witness and give defense counsel the opportunity to interview him and make a reasoned determination whether to seek his retention pending trial." Id.

In analyzing the second prong, the Court held that a showing of prejudice requires "a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." Id. at 971 (citing to Valenzuela–Bernal, 458 U.S. at 873). The materiality requirement necessitates that the suppressed evidence might have affected the outcome of the trial. Id.

### 2. Witness Relevance

Kelson Laborde-Dickson was the passenger in Ms. Marshall's car at the time of their entry into the United States. Mr. Laborde-Dickson is the only person who confirms the events in Mexico, who details the amount of alcohol that Ms. Marshall drank over the course of hours, and who confirms the pile-up or "swarm" of officers around Ms. Marshall prior to being brought into the secondary security office. Mr. Laborde-Dickson was held by immigration and was questioned, on video, by the case agent and other assisting agent.

After receiving the case, counsel and her investigator attempted to locate Mr. Laborde-Dickson in immigration custody. He was never located. It appears that he was deported by ICE or DHS as he now has returned to London. His whereabouts prior to his departure were never disclosed to counsel and the government did not

alert counsel of his pending deportation nor did they keep him as a material witness. In conversations with previous government counsel it was believed the government also did not know the location of Mr. Laborde. Based on discovery, however, it appears he may have been deported within days of the incident, as this would also coincide with the immigration detainee locator's failure to locate any derivation of his name.

Kelson Laborde-Dickson was deported quickly after his arrest. The government's documents (at D62) note that he was "expeditiously removed from the United States." The government agents had the opportunity to question Mr. Laborde-Dickson prior to their interrogation of Ms. Marshall. It was videotaped. In the recording Mr. Laborde-Dickson noted the following facts: 1) the amount of alcohol he believed Ms. Marshall had ingested prior to arriving at the port; 2) the rarity in which she drank alcohol; 3) the physical abuse and robbery which occurred by law enforcement in Mexico; and 4) the swarm of officers around Ms. Marshall in secondary.

Here, Kelson Laborde-Dickson is the only witness, other than Ms. Marshall, who can comment on what occurred prior to their entry into the United States and what occurred in secondary prior to his entry into secondary security office. This is material to her perception and ability to form the requisite intent to assault. He is also the only person who can confirm statements Ms. Marshall made to officers regarding what occurred in Mexico. His statements also cast doubt on the credibility of agents'/officers' statements, at least one which has Ms. Marshall being very lucid and agile in her movements, grabbing car keys and lunging at Officer Garripo.

C.    Destruction of evidence

For the destruction of evidence to rise to the level of a constitutional violation, a party must make two showings. First, the government must act in bad faith, which is shown by "the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." See Arizona v. Youngblood, 488 U.S.

13

51, 56–57 (1988). Second, the missing evidence must be "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." United States v. Sivilla, 714 F.3d 1168, 1172 (9th Cir. 2013)(citing to California v. Trombetta, 467 U.S. 479, 489 (1984)). Conversely, the test requires the showing of bad faith where the evidence is only potentially useful and not materially exculpatory. Id. (citing to United States v. Del Toro–Barboza, 673 F.3d 1136, 1149 (9th Cir. 2012)). For evidence to be materially exculpatory, its exculpatory nature must be apparent. See Id.

### 1. Failure to Preserve Keys in Condition

The indictment alleges the instrumentalities of the assault were Ms. Marshall's car keys. In United States v. Chapman, 528 F.3d 1215, 1218-19 (9th Cir. 2008), the Ninth Circuit held that §111 defines three separate offenses, one "simple assault" misdemeanor and two felonies. The "simple assault" provision is a misdemeanor and all other cases including those with a dangerous weapon or bodily injury are felonies. Id. Under Chapman, each is a separate and distinct criminal offense. Id. at 1218. Mere "resistance," "opposition," or "impediment" to a desire to carry out an official duty would not constitute assault under Chapman. Id. at 1220.

The keys appear to have been preserved at D19 which is a customs seized property and evidence receipt. However, when counsel spoke with previous government counsel, it was mentioned that the keys were not preserved in any way where DNA or any assessment could be taken as numerous people had handled the keys since the time of seizure/arrest. The keys are available for viewing by counsel at this point but the government has failed to maintain the keys prior to seizure to allow for DNA testing to determine whether the keys were the cause of the cut on Officer Garippo's face. As the keys were alleged to be the instrumentality of the assault, a failure to preserve the keys in the appropriate condition to determine whether they were the instrumentality of the assault constitutes destruction of evidence.

## 2. Failure to Preserve Video of Previous Dealings

Ms. Marshall's statements to Officer Garripo and during the interrogation note that Ms. Marshall previously used the restroom while in secondary. The chain of events that precipitated the attempt to restrain Ms. Marshall by grabbing her arm and pushing her against her car, was Officer Garripo's refusal to allow Ms. Marshall to use a restroom and telling her she must wait in her car. At this point, although secondary recordings exist, there does not appear to be a recording of Ms. Marshall in secondary inspection with Mr. Laborde-Dickson prior to the events immediately prior to the alleged assault.

In order for an assault on a federal officer to be a valid assault, the officer must be engaged in or performing official duties. Courts have recognized that an officer who is using excessive use of force in pursuit of an official duty is not considered a "good faith performance" of official duties within the parameters of §111. See United States v. Spam, 75 F.3d 1383, 1389 (9th Cir. 1996). A previous officers decision to allow Ms. Marshall to use the restroom prior to this incident with Officer Garripo would assist the jury in determining whether Officer Garripo was acting in his official duties at all and also determine whether he used excessive force which would negate the good faith performance of official duties.

## 3. Failure to Preserve Original Video for Enhancement

Counsel has received a copy of the minutes prior to the alleged assault in secondary. Counsel has submitted this grainy video to an enhancement company who states that the copy of the video does not allow enhancement and that the making of the copy corrupted the video. Through discussions with government counsel, it appears the original video may exist, however, Customs and Border Protection has not made the video available. If the video does not exist in a format available for enhancement, the government's failure to maintain the video prejudices Ms. Marshall.

To constitute an assault, an action must be "either a willful attempt to inflict injury upon the person of another, or ... a threat to inflict injury upon the person of

15

another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm." <u>Chapman</u>, 528 F.3d at 1219-20 (citing to <u>United States v. Dupree</u>, 544 F.2d 1050, 1051 (9th Cir.1976).)  The video assists in determining whether an attempt to inflict injury was willful or whether there was a reasonable apprehension of immediate bodily harm in a few ways. The video shows the condition of Ms. Marshall, including her ability to walk and see.  The video shows what is in Ms. Marshall's hand when she is speaking to agents and when Officer Garripo grabs her arm.  The video shows whether Officer Garripo is speaking into a microphone/communication device of some kind on his shoulder prior to his decision to physically grab Ms. Marshall.  The video shows the interaction prior to the incident as well as showing the incident itself.  Counsel has had to repeatedly watch the video to attempt to decipher what occurred as did previous government counsel.  Counsel still cannot see clearly.  It is anticipated the jury would need to do so as well.  If the video were capable of enhancement, it would help to answer some of these questions.

### 4.    Failure to Take Blood Alcohol

Although Ms. Marshall exhibited clear signs of severe intoxication at secondary and following secondary inspection in the holding cells, it appears at no time was a breathalyzer or a blood alcohol draw performed.  At least one medical professional did assess Ms. Marshall but it doesn't appear that any tests were performed at this time or requested.

In determining her ability to form intent, as well as her credibility as to the events of September 25, 2014, her alcohol intake and level of intoxication is extremely important.  The only objective measure of her alcohol intake from that day are the statements of Mr. Laborde-Dickson, who the government expeditiously deported.

### D.    <u>Outrageous Government Conduct</u>

### 1.    Facts in Secondary

Ms. Marshall sat in the secondary lot, as a passenger in her car, a United States

Citizen. Ms. Marshall was intoxicated and it was in the early morning hours of September 21, 2014, around 5:50 a.m. [D11]. After confirming Ms. Marshall's United States citizenship, CBPO Garippo told Ms. Marshall she needed to wait in the car. [D11]. Ms. Marshall put her arms on the car and put her forehead in her arms. CBPO Garippo asked her if she was ok and she said no, that she couldn't see, that she was missing a contact, and that the Tijuana police beat her up and busted her lip. [D11]. After this, Ms. Marshall tried to use the restroom. CBPO Garippo allegedly told her that was fine but that she needed to ask permission. [D11]. Ms. Marshall informed the officer that she had previously gone to the bathroom earlier. CBPO Garippo alleges Ms. Marshall then became aggressive pointing her finger in the officer's face and saying she was going to "pee right here." CBPO Garippo then tried to restrain and handcuff Ms. Marshall as she walked back to her car. He claims that she pulled her arm away and "got into a fighting stance." [D11]. His narrative report has him pinning her against the car while he is struck in the right eye with keys in Ms. Marshall's right hand. At this point, Officer Garippo claims other officers then descended onto the situation to try to restrain and control Ms. Marshall. [D11].

CBPO May gives a conflicting account. She states that Ms. Marshall was stumbling around in a daze outside the car and CBPO Garippo asked her to remain in her car. CBPO May then said that Marshall took a fighting stance by "blading off," raised her voice, and yelled profanities. [D14]. She then claims she witnessed Ms. Marshall "grab a set of keys" and "clench them in her fist," and raise her voice. [D14]. CBPO May also believed the keys were a "pocket knife" and tried to "stop Marshall" but it was too late. [D14]. She also notes that Ms. Marshall raised her right arm and hit CBPO Garippo with her keys.

The only video available of the incident in secondary, and disclosed by the government, definitely contradicts Officer May's account of the sequence of events in secondary and somewhat contradicts Officer Garippo's. [D11, D14]. The video, albeit grainy, seems to show Ms. Marshall returning to her car after a heated

17

exchange with Officer Garippo. It is at this point, while walking back to her car, that Officer Garippo grabs Ms. Marshall by her arm and seems to be pushing her against her car. It is during this push that it appears Officer Garippo receives injury while simultaneously other officers descend on Ms. Marshall. On video, she does not reach to grab a set of keys from the car or any other place as claimed by Officer May. She also has multiple officers surrounding her and rushing to her at the point when Officer Garippo is pushing her against the car.

## 2. Applicable Case Law

Police officers must use a reasonable level of force to effectuate an arrest and cannot use excessive force. See Luchtel v. Hagemann, 623 F.3d 975, (9th Cir. 2010) (citing to Palmer v. Sanderson, 9 F.3d 1433, 1436 (9th Cir. 1993)). Whether an individual has been subjected to excessive force under the Fourth Amendment utilizes a reasonableness standard detailed in Graham v. Connor, 490 U.S. 386, 395 (1989). In conducting this analysis, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Id at 396.

In Graham the Court noted the focus on the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Also to be considered are the totality of the circumstances, the amount of force used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and the plaintiff's mental and emotional state. Luchtel, 623 F.3d at 980.

The "single most important element," whether the suspect poses an "immediate threat to the safety of the officers or others" weighs entirely in Ms. Marshall's favor. She poses no threat to the safety of officers or others prior to the officer's grabbing her arm, pushing her against the car, and having multiple officers descend on her physically. See Smith v. City of Hemet, 394 F.3d 689, 702 (9th Cir. 2005).

1  As far as the other two factors, they are difficult to decipher. The severity of
2  the crime at issue does not appear to be a factor to consider at all. Ms. Marshall is not
3  committing a crime at the time of her physical restraint by Officer Garripo. The
4  consideration of whether she was actively resisting arrest is also difficult to assess.
5  At the time of her physical restraint, she wasn't under arrest and had not been told
6  that she was under arrest, according to the officers reports. The act of swinging her
7  arm which resulted in the abrasion to Officer Garippo could conceivable be seen as
8  resisting arrest however, that is also the act of self-defense in the face of excessive
9  force. "[T]he excessive use of force in the pursuit of official duty is not considered
10 a good faith performance of official duties within the definition of section 111."
11 United States v. Span, 75 F.3d 1383, 1389 (9th Cir. 1996).

12    Outrageous government conduct exists when officers conduct is "so outrageous
13 that due process principles would absolutely bar the government from invoking
14 judicial processes to obtain a conviction." United States v. Black, 733 F.3d 294, 302
15 (9th Cir. 2013) (citing to United States v. Russell, 411 U.S. 423, 431–32 1973).) The
16 remedy of dismissing an indictment is limited to extreme conduct in which the
17 government's conduct "violates fundamental fairness" and is "so grossly shocking and
18 so outrageous as to violate the universal sense of justice." Id. (citing to Stinson, 647
19 F.3d at 1209). The only available cases in which dismissal has been found to be
20 warranted are cases involving reverse sting- entrapment type cases and those
21 involving coercion. See United States v. Twigg, 588 F.3d 373 (3rd. Cir 1978); see
22 also Greene v. United States, 454 F.2d 783 (9th Cir. 1971); see also State v. Lively,
23 130 Wash.2d 1 (1996). There is no bright line for making this determination so
24 courts are to do a individual fact base analysis in every case. See Black, 733 F.3d at
25 302.

26    Although the Ninth Circuit has listed factors to consider, the applicability of
27 those factors to this case is again difficult. The Black court determined the following
28 factors as relevant: (1) known criminal characteristics of the defendants; (2)

individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue. <u>Id</u>. Although seemingly inapplicable to the factual scenario in this instance, even applying these factors, the government conduct here is outrageous. Ms. Marshall had no known criminal disposition or characteristics. There was no individualized suspicion that she was engaged in any wrongdoing outside being intoxicated and threatening to urinate in her car. The government's role in creating the crime of conviction is an easier application. The government officers grabbing of Ms. Marshall and pushing her backwards towards her car is clearly the reason for her swinging her arm in the direction of officers. As far as encouraging to commit the conduct, outside the impetus of her arm swinging, this appears inapplicable. In analyzing the government's participation, again, this appears to be as the cause or reason for the crime occurring. Lastly, the nature of the crime being pursued and necessity for the actions in "light of the nature of the criminal enterprise" is somewhat applicable. There is no crime being pursued, other than intoxication and threats of public urination, and there is no necessity for the government use of excessive force. In fact, there was no reason for agents or officers to physically restrain Ms. Marshall in any way at the time that she was manhandled by officers.

For all these reasons, and the government's use of excessive force, the indictment should be dismissed.

**V.    Conclusion**

Ms. Marshall requests the Court grant her motions.

Date: January 5, 2015                    /s/ *Holly A. Sullivan*

                                         HOLLY A. SULLIVAN

### CERTIFICATE OF SERVICE

The preceding has been served on all parties via ECF.

/s/ *Holly A. Sullivan*

HOLLY A. SULLIVAN